**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| RONNI MARKS, | ) | |
| | ) | |
| Plaintiff, | ) | **CASE NO.** |
| | ) | |
| v. | ) | |
| | ) | |
| SKYWEST AIRLINES and JASON | ) | |
| ALEXANDER, in his individual and | ) | **JURY TRIAL REQUESTED** |
| professional capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff Ronni Marks ("Plaintiff" or "Marks") by and through her attorneys, Wigdor

LLP, as and for her Complaint against Defendants SkyWest Airlines ("SkyWest" or the

"Company") and Jason Alexander ("Alexander," collectively, "Defendants") alleges as follows:

**PRELIMINARY STATEMENT**

1.      As a young flight attendant breaking into the airline industry, Plaintiff Ronni

Marks was accustomed to taking trips accompanied by a largely male crew.

2.      Given her age, she viewed these men not as friends or even colleagues, but as

authority figures who would protect her and watch out for her and the other young women who

worked on flights for SkyWest Airlines.  Ms. Marks came to count on the Company's senior

male employees, to protect her and ensure her safety on these flights, which could often take

several days and require her to spend nights in numerous unfamiliar cities as a single woman.

3.      The absolute last thing that Ms. Marks could ever imagine was that one of these

men, the pilot on one of her flights, would drug her and proceed to sexually assault her.  But this

is precisely what happened when Ms. Marks worked as a flight attendant on a flight that Defendant Alexander piloted to Indiana.

4. During a layover, Ms. Marks joined Mr. Alexander for drinks at the bar in the hotel in which the crew was staying.

5. The drinks started off innocuously and professionally, with both Plaintiff and Alexander speaking generally about their backgrounds and history. Nothing romantic or remotely sexual was ever discussed.

6. Subsequently, Defendant Alexander convinced Ms. Marks to join him in his room, ostensibly for a drink after the hotel's bar had closed. Ms. Marks, having no reason to distrust Defendant Alexander at that point, agreed, despite her reservations about being in alone in a room with a man she hardly knew. But, trusting her pilot, Ms. Marks agreed to meet him after she returned to her own room to use the bathroom.

7. Once in the room, Mr. Alexander offered Ms. Marks a cranberry and vodka cocktail that he had prepared. That was the last clear memory that Ms. Marks would have of that night.

8. She woke up the next day, naked, in Defendant Alexander's bed with no idea how she had gotten there. Outrageously, Defendant Alexander laughed at her confusion and cavalierly told her that they had engaged in sexual intercourse and that he had tied her up in the process.

9. Even after waking up and attempting to shower back in her own room, Ms. Marks struggled to remain conscious, causing her to suspect that she had been drugged at some point the previous night as she had not consumed nearly enough alcohol to lose her memory. Of

course, she was in no position to consent to sexual intercourse, a fact that Defendant Alexander undoubtedly knew.

10. When Ms. Marks complained to SkyWest about what had occurred during the course of her and Defendant Alexander's employment, she was further shocked to find that the Company was virtually as cavalier about one of its employees raping another during a business trip as Defendant Alexander had been. Indeed, SkyWest proceeded to punish *Ms. Marks* while allowing Defendant Alexander to continue working uninterrupted, where he access to other young, unsuspecting flight attendants.

11. Incredibly, this is not the first time that SkyWest has allowed one of its pilots to sexually assault, and possibly drug, one of its flight attendants. Just four years earlier, another flight attendant experienced events hauntingly similar to Ms. Marks' own experiences. Specifically, during a layover, a male pilot apparently drugged her drink and proceeded to have sexual intercourse with her against her will.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

## PARTIES

14. Plaintiff Ronni Marks is an employee of SkyWest Airlines residing in the state of Arizona.

15.     Defendant SkyWest Airlines is airline headquartered in St. George, Utah, United States.

16.     Defendant Jason Alexander is an employee of SkyWest Airlines. Upon information and belief, Defendant Alexander lives in the state of Texas.

**FACTUAL ALLEGATIONS**

**I.      BACKGROUND**

17.     Ms. Marks joined SkyWest immediately after graduating from Northern Arizona University in April 2021, where she earned a bachelor's degree in Political Science.  Ms. Marks had dreamed of working in the airline industry since childhood.  Her father is pilot, her mother is a flight attendant and she has other family members that also work in the airline industry.

18.     Ms. Marks literally grew up in the industry and believed that it offered her an unparalleled opportunity to see the world and experience different cities and cultures.  As such, she entered SkyWest's flight attendant training program in July 2021 and officially started flying as a reserve flight attendant in September 2021, based out of the Dallas-Fort Worth area in Texas.

19.     As a reserve flight attendant, Ms. Marks would get scheduled on flights when a regular flight attendant had to cancel that trip.  As a result, she worked an average of four to five days a week and was guaranteed 76 hours a month.  Though new to the role, Ms. Marks' passion and dedication earned glowing reviews from her flight crews who appreciated her willingness to step in at the last minute and oversee trips that could last days at a time.  By all lights, Ms. Marks had a bright future with SkyWest and was looking forward to being promoted to a full-time flight attendant position later this year.

II.    **MS. MARKS IS HORRIFICALLY AND BRUTALLY RAPED WHILE WORKING FOR SKYWEST**

20.    Ms. Marks' promising career was derailed in 2022 during a flight when she experienced one of the most brutal and traumatic events that any woman can experience.

21.    In early 2022, Ms. Marks was contacted by the Company who informed her that the regular flight attendant was unable to make a four-day trip that went through Dallas, Texas; Grand Rapids, Michigan; Roswell, New Mexico; and South Bend, Indiana.

22.    On the second night of the trip, the entire crew deplaned for a layover in South Bend, Indiana.  They reached their hotel, the Aloft South Bend (the "Aloft"), at approximately 10:45 pm.

23.    Ms. Marks wanted to get a drink and asked the rest of the flight crew (none of whom she had met before that trip) if they wanted to join her.  The pilot and a male flight attendant declined, but Defendant Alexander, the First Officer on the crew, told Ms. Marks that he was interested.

24.    Ms. Marks and Defendant Alexander proceeded to the bar where she had two drinks, and he had one over the course of an hour.  During this time, they engaged in banal small talk about their backgrounds, with Defendant Alexander telling Ms. Marks about his time in the armed forces.  Importantly, there was nothing sexual or even flirtatious about their conversation. To the contrary, Defendant Alexander spoke openly about the fact that he was married and had children, allowing Ms. Marks to let her guard down and believe that he would have no interest in her romantically.

25.    Thereafter, around midnight, after the bar had closed, Defendant Alexander told Ms. Marks that he had more alcohol in his room and offered to get it to bring down to the lobby so that they could share another drink before going to their separate rooms for the night.  Still

5

wound up from her flight, Ms. Marks agreed that she would have one more drink with Defendant Alexander. She told him that she was going up to her room (which, coincidentally, was next to Defendant Alexander's) to use the bathroom and would meet him back in the lobby. Defendant Alexander told her to knock on his door and get him when she was done in the bathroom so he would not have to wait in the lobby alone.

26.     After Ms. Marks was done using the bathroom, she accordingly knocked on his door and told him she was ready to return to the lobby. Defendant Alexander responded by asking her if they could stay in his room for a few minutes because he wanted to vape and did not think they would allow him to do so in the lobby. Although she was uncomfortable with the idea of being alone with a man whom she barely knew, Ms. Marks had no reason to consider that Defendant Alexander had any ulterior motives at this point and agreed.

27.     In his room, Defendant Alexander offered to make Ms. Marks a vodka and cranberry juice cocktail, expressing surprise when she told him that she had never had one before. After he made the drink, Ms. Marks excused herself again to return to her room to use the bathroom before returning to Defendant Alexander's room.

28.     This was the last thing that Ms. Marks recalled until she woke up at 2 pm the next afternoon, naked in Defendant Alexander's bed. Defendant Alexander was lying next to her, also naked, and staring at her. Ms. Marks was groggy, lightheaded and felt physically ill. Although by no means a heavy drinker, Ms. Marks had never felt overly intoxicated after only three drinks, to say nothing of blacking out from that quantity of alcohol.

29.     To wake up in a stranger's bed, completely naked, simply made no sense to her; it was as if she was watching someone else's life unfold before her. Understandably confused and disoriented, Ms. Marks asked Defendant Alexander what had happened. Defendant Alexander

literally laughed at Ms. Marks' confusion and told her that they had had sexual intercourse the previous night.  Aghast, Ms. Marks denied that had happened.  Defendant Alexander again laughed as Ms. Marks became increasingly visibly upset, saying that she did not remember anything that happened.  Defendant Alexander continued to laugh and told Ms. Marks that she was "asking for it."

30.     As Ms. Marks attempted to climb out of bed and get dressed, she felt a sharp, throbbing pain on the bottom of her left buttock.  Ms. Marks asked Defendant Alexander what had happened, and he just laughed but refused to answer her question.  Ms. Marks also noticed that Defendant Alexander's pajama bottoms were near the foot of the side of the bed on which she had been sleeping and asked Defendant Alexander how they had gotten there.  He told her that he had used them to tie her up while he was having sex with her.  At this point, Ms. Marks vaguely recalled briefly regaining consciousness the previous night to feeling herself being anally penetrated.  However, despite the fact that she objected to the feeling and wanted it to stop, she was too tired and felt too powerless to do anything before she blacked out again.

31.     Defendant Alexander then told Ms. Marks that she had consumed the entire bottle of vodka by herself, which Ms. Marks had no recollection of doing.  Indeed, it would have been physically impossible for Ms. Marks to consume that much alcohol in one sitting, and she had never come close to approaching drinking an entire bottle on her own.  This only added to her sense of confusion and distress.

32.     Ms. Marks was horrified and attempted to gather her clothes and jewelry, which were strewn about Defendant Alexander's room.  She could not find all her possessions and rather than spend more time with Defendant Alexander staring at her after having violently raping her, she gave him her number to contact her if he found her remaining jewelry.  Ms.

7

Marks then returned to her room where she attempted to take a shower. However, her head was swimming so much that it felt as if she could not stand. Ms. Marks noticed that she had bruises on both of her buttocks and what appeared to be bite marks on her breasts that were certainly not there the night before and which she had no recollection of getting.

33. She proceeded to try and force herself to vomit, hoping that would clear her head, but she only succeeded in dry heaving and ejecting some bile from her stomach. As Ms. Marks left the bathroom, she was still utterly confused and disoriented. She saw her bed and could not understand why it was still fully made up and looked like it had not been slept in the night before. One part of her still believed that she had returned to her room and watched Netflix as she had originally intended. Her mind would not allow her to acknowledge the vicious crime to which she had been subjected.

34. Incredibly, at around 4 pm, Ms. Marks began to feel perfectly fine. Her head abruptly stopped swimming, her feelings of wooziness dissipated, and she felt normal, aside from the physical pain from the bruising on her body. Of course, no hangover from alcohol would dissipate so quickly. Although we are still awaiting the results of the rape kit that had been performed on Ms. Marks, we suspect that it will show that she was drugged by Defendant Alexander, likely by putting something in her drink while she was in her bathroom the previous evening. It is the only explanation for Ms. Marks not remembering anything after consuming less than three full drinks and recalling being too debilitated to even react when she realized someone was anally penetrating her. Additionally, had Ms. Marks consumed an excessive amount of alcohol, she likely would have been able to vomit the next morning rather than simply dry heave. Defendant Alexander then monstrously used Ms. Marks' incapacitated state as means of raping her.

**III.    THE COMPANY PUNISHES MS. MARKS UPON LEARNING THAT SHE HAD <u>BEEN RAPED BY ONE OF ITS EMPLOYEES</u>**

35.    Because she was no longer feeling intoxicated in any manner, Ms. Marks joined the crew for the return trip back to Dallas.  On the flight, she texted one of her close friends and told her what had happened:





36.     Ms. Marks proceeded to have her friend call the Company's InFlight Support and let them know that she would not be able to proceed with the remainder of the trip.  Upon landing, Ms. Marks herself also called InFlight Support and told them that she had been raped but did not say that it was by a pilot.  She then went to a Fort Worth area hospital, where they

conducted a full rape kit.  Ms. Marks also filed a police report with the Fort Worth police department.  The hospital told Ms. Marks that the report of the rape kit and the toxicology report would not be available for two to three months.

37.    Two days later, on or about January 16, 2022, Ms. Marks called Tegan Wainwright (Manager of Employee Relations) and informed Ms. Wainwright that her rapist was Defendant Alexander.  Ms. Marks gave Ms. Wainwright a detailed verbal report describing the moments leading up to her rape and the aftermath, and further explained that she could not remember anything that happened after she returned to Defendant Alexander's room, likely because she had been drugged.

38.    Ms. Wainwright indicated that SkyWest was going to investigate Ms. Marks' allegations.  Ms. Marks was confused and asked how the Company could conduct a legitimate investigation without the results of the toxicology report and the rape kit, which would not be available for months.  Incredibly, Ms. Wainwright told Ms. Marks that the results of the rape kit and the toxicology report "didn't matter" for the purposes of SkyWest's investigation and that the Company felt that it could proceed without it.

39.    Ms. Marks was understandably concerned about how the Company could conduct a full investigation without evidence of what happened to her and asked what would happen if Defendant Alexander was not found guilty over the course of the investigation.  Ms. Wainwright informed her that Defendant Alexander would continue to work unimpeded.  Ms. Marks then asked whether the Company could agree not to have her work with Defendant Alexander again.

40.    Outrageously, Ms. Wainwright said the Company would not agree to that and that, if Ms. Marks was scheduled to work with Defendant Alexander, she would have to call in sick.  Ms. Marks explained that because all reserve flight attendants are on probation for one

year, she could not call in sick without getting fired.  Ms. Wainwright blithely brushed aside Ms. Marks' legitimate concerns, telling her that she should just "hope" she and Defendant Alexander would not get scheduled on the same flight for the next eight months.

41.     Ms. Wainwright further told Ms. Marks that the Company required her to sign a confidentiality agreement and provide a written statement as part of any investigation.  After reading the confidentiality agreement, Ms. Marks realized that she could not sign it.

42.     By way of example only, it prevented Ms. Marks from speaking to anyone about what had happened to her.  Thus, if one of her friends was scheduled to work with Defendant Alexander, she would have to sit silently while other vulnerable young women were left alone with her rapist.  It should go without saying that this was unacceptable to Ms. Marks.  It was clear from the Company's various statements surrounding the investigation that no one at the Company was looking out for the interests of a victim of a horrific and traumatic crime.  Instead, the Company seemed to be conducting a *pro forma* (not being interested in the results of the rape kit/toxicology report), hush hush (binding Ms. Marks to silence) investigation with the sole goal of protecting its own interests, and, incredibly, the rapist himself.

43.     Ms. Marks therefore informed the Company that she would not be in a position to sign anything, or submit anything in writing, without having had the opportunity to consult with a lawyer.  Ms. Wainwright responded by informing Ms. Marks that the Company was putting her on an unpaid administrative leave until she submitted a written statement.  Incredibly, the Company was effectively suspending Ms. Marks while, after having sidelined her for weeks, while her rapist was allowed to continue to fly unimpeded.

## IV.    DEFENDANT SKYWEST'S HISTORY OF MISTREATING ITS EMPLOYEES

44.    Unfortunately, this is not the first instance in which SkyWest has shown a complete disregard for the safety and well-being of its employees.

45.    In 2018, in a case with striking similarities to Ms. Marks' rape, SkyWest allowed another one of its pilots to rape a flight attendant during a layover.[1]

46.    The victim, Mary Morgan, a 14 year flight attendant for SkyWest, alleged that she had been raped by one of the Company's pilots, Capt. Robert L. Rowe during a layover.

47.    According to Ms. Morgan, "on a layover," she had "drinks with colleagues" and believed that Capt. Rowe "drugged and raped" her.

48.    Specifically, Ms. Morgan, like Ms. Marks, consumed a drink that Capt. Rowe offered to her and subsequently could not remember what happened to her for the remainder of the night.

49.    Ms. Morgan alleged, like Ms. Marks, "that she was in a fog but not intoxicated."

50.    She then, also like Ms. Marks, "woke up the next morning in his bed, naked and with bruises on her body" and knew "she had been raped."

51.    As with Ms. Marks, SkyWest initially refused to investigate Ms. Morgan's complaint and punished her, rather than her rapist, thereafter.

52.    Incredibly, despite knowing of its pilots' proclivity for wanton and unlawful behavior, last year, SkyWest filed a request with the United States Department of Transportation to allow it to employ pilots with lesser certifications than had been required under the law previously.[2]

---

[1]    https://www.cnn.com/2018/05/14/us/airline-sexual-assault-lawsuits/index.html
[2]    https://cowboystatedaily.com/2022/06/27/due-to-pilot-shortage-skywest-to-remove-seats-to-allow-pilots-with-lower-level-certifications/

53.     This is not the only instance in which SkyWest has allowed the unlawful mistreatment of its employees to proceed without taking even basic steps to address it.  Just last year, the Equal Employment Opportunity Commission (the "EEOC") filed a lawsuit against SkyWest in the Northern District of Texas alleging sexual discrimination and a hostile work environment stemming from the fact that, *inter alia,* male employees "made a number of comments making light of rape, suggesting engaging in rape, or arguing that rape victims were lying for attention."[3]

54.     Also last year, a group of flight attendants brought a class action against SkyWest for violations of California's wage payment statutes.[4]

**FIRST CAUSE OF ACTION**
**(Negligence, Negligent Supervision and Negligent Retention)**
*Against Defendant SkyWest Airlines*

54.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

55.     Defendant SkyWest owed Plaintiff a duty of reasonable care in the hiring, supervision and retention of its employees.

56.     Defendant SkyWest did breach that duty of care in the hiring, retention and/or supervision of Defendant Alexander who was unfit to be employed and who was not adequately supervised during his employment.

---

[3]     Compl. ¶ 21, *Equal Employment Opportunity Commission v. Skywest Airlines, Inc.,* No. 3:22-cv-01807-c (N.D.T. August 17, 2022).

[4]     https://www.lawyersandsettlements.com/legal-news/california_labor_law/SkyWest-flight-attendants-file-rest-meal-break-california-lawsui-23456.html

57.     Defendant SkyWest knew or should have known that its negligence and breach of duty of care would cause or had a substantial probability of causing severe emotional distress to Plaintiff, and in fact did cause her severe emotional distress.

58.     Accordingly, Plaintiff is entitled to recovery against Defendant SkyWest in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Respondeat Superior)
### *In the Alternative, Against Defendant SkyWest Airlines*

59.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

60.     At the time that Defendant Alexander raped Plaintiff, he was employed by Defendant SkyWest Airlines and performing his job as a pilot.

61.     Defendant Alexander's conduct in sexually assaulting Ms. Marks was performed during the course of his employment with Defendant SkyWest Airlines.

62.     Accordingly, Plaintiff is entitled to recovery against Defendant SkyWest in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Sexual Assault)
### *Against Defendant Jason Alexander*

63.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

64.     The violent sexual acts committed intentionally by Defendant Alexander against Plaintiff and without her consent, including, but not limited to, his sexual assault of Plaintiff, created a reasonable apprehension in Plaintiff of immediate harmful or offensive contact to Plaintiff's person.

15

65. As a direct and proximate result of the aforementioned assault, Plaintiff has sustained in the past, and will continue to sustain, *inter alia*, physical injury, monetary damages, pain and suffering, psychological and emotional distress, humiliation and loss of career fulfillment.

66. Defendant Alexander's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Sexual Battery)
### *Against Defendant Jason Alexander*

67. Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

68. The violent sexual acts committed intentionally by Defendant Alexander against Plaintiff and without her consent, including, but not limited to, his sexual assault of Plaintiff, constitutes a harmful and offensive contact to Plaintiff's person.

69. As a direct and proximate result of the aforementioned assault, Plaintiff has sustained in the past, and will sustain in the future, inter alia, physical injury, monetary damages, pain and suffering, psychological and emotional distress, mental anguish, embarrassment, humiliation and loss of career fulfillment.

70. Defendant Alexander's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

### FIFTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress)**
*Against All Defendants*

71. Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

72. Defendants engaged in conduct toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society.

73. Defendant Alexander's conduct of forcibly and violently sexually assaulting and raping Plaintiff is extreme and outrageous conduct that shocks the conscience.

74. Defendants' actions were taken with intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

75. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

76. Defendants' conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

### SIXTH CAUSE OF ACTION
**(Negligent Infliction of Emotional Distress)**
*In the Alternative, Against All Defendants*

77. Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

78. Defendants owed Plaintiff a duty of care to prevent her from suffering harm during the course of her employment.

17

79.    By sexually assaulting her, Defendant Alexander breached his duty of care to Plaintiff.

80.    By allowing Defendant Alexander to sexually assault Plaintiff, Defendant SkyWest breached its duty of care to Plaintiff.

81.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of Indiana;

B.    An injunction and order permanently restraining Defendants and their partners, officers, owners, officials, agents, successors, employees and/or representatives, and any and all persons acting in concert with and/or on behalf of them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her physical injuries, mental anguish, psychological harm, and emotional distress;

E.      An award of punitive damages and any applicable penalties in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      An award of fees and costs that Plaintiff has incurred in this action, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 24, 2023
      New York, New York             Respectfully submitted,

**SHAW LAW**
By:  /s/ Jeff Shaw
      Jeff Shaw, Esq
203 W. Jefferson Blvd.
Fort Wayne, IN 46802

jeffshaw@slipandfall.com

**WIGDOR**


By: /s/ Michael J. Willemin
      Michael J. Willemin
      (to be admitted pro hac vice)
      Renan F. Varghese
      (to be admitted pro hac vice)

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
rvarghese@wigdorlaw.com

*Counsel for Plaintiff*